J. B. SMOOT, Executor of the Estate of Everett McCandless, Appellant,

v.

Hosea McCANDLESS, Appellant,

Walter W. Ahland, Jr., and Fayetta Ahland, Respondents.

Walter W. AHLAND, Jr., and Fayetta Ahland, Respondents,

v.

ESTATE OF Everett McCANDLESS and J. B. Smoot, Executor, Appellants.

No. 54981.

Supreme Court of Missouri, Division No. 2.

Dec. 14, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied Jan. 11, 1971.

Tom Brown, Edina, John Ed Luther, Memphis, and Zenge & Smith, Canton, for appellants.

E. Richard Webber, Memphis, for respondents.

HENRY I. EAGER, Special Commissioner.

These consolidated cases involve the validity, in whole or in part, of an article of the will of one Everett McCandless, and its ultimate effect. The trial court awarded the residue of the estate to the defendants-respondents Ahland, holding a part of the article in question to be void and the remainder valid and effective. The Executor and a brother, the only heir-at-law, have appealed.

Everett McCandless, approximately 77 years of age, executed his will on April 26, 1967; it was prepared by his close friend and lawyer, J. B. Smoot of Memphis, Missouri. The only part of the will which is material here is Article Third, which we quote: "All of the rest, residue and remainder of my property, real, personal and mixed, and wheresoever located, I give, devise and bequeath unto the person or persons who care for and look after me and provide me with a home and the comforts of life during my declining years, but I specifically exclude a nursing home, convalescent home, hospital or other institution that cares for people for a stipulated sum and holds themselves out to the public as a home for aged or incapacitated persons. I direct that my Executor, hereinafter named, to be the sole judge as to who has performed the major part of caring for me during my declining years and he shall designate the person or persons who shall receive my residuary estate." Mr. McCandless died in October 1968, the will was probated, and Mr. Smoot was appointed Executor.

The question of our jurisdiction has not been satisfactorily covered in the trial record or in the briefs. The chief asset of Mr. McCandless was a farm, but it further appears that he sold substantially all of the farm on a so-called "contract for deed." The inventory of his estate was not placed in evidence and we do not accept mere statements of counsel on the monetary value of the assets or the amount in dispute. It

does appear from the evidence that the testator retained two small tracts when he sold the farm and presumably owned them when he died. With some reluctance we accept jurisdiction, on the theory that the title to some real estate is involved. We need not decide the status of the title on the main farm.

The Executor filed a declaratory judgment suit seeking a construction of Article Third of the will, attaching and incorporating into his petition a copy of the will. He alleged: the substance of Article Third; that Hosea McCandless (named as a defendant) was a brother of the decedent and the only heir-at-law; that the decedent had on May 8, 1967, entered into a contract with defendants Walter W. Ahland, Jr. and his wife Fayetta, by which the Ahlands contracted to care for the decedent (a copy being attached and incorporated), and that they were presumably claiming an interest in the estate by reason of such contract; that the Executor expressly refused to exercise the said power of appointment, but he further stated affirmatively that the decedent "performed the major part of caring for himself during his declining years." He also alleged that if the provision granting the power to him was valid and enforceable then he thereby exercised the discretion vested in him by declaring: that Walter W. Ahland, Jr. and his wife did not perform the major part of caring for the decedent during his declining years and are not entitled to receive the residue of the estate; that disputes exist as to the validity of the power and as to "who is entitled to the residue of the estate."

The Ahlands by answer admitted all formal allegations, denied the substantive allegations and particularly denied the authority of the Executor to exercise the power granted in Article Third. Defendant Hosea McCandless admitted all essential allegations of the petition.

In a separate action (in three counts) the Ahlands sought: recovery of $25,875 (Count I) for breach of the contract between them and Everett McCandless, which amount was alleged by them to be the value of the farm which he had sold; the recovery of $125 per month (Count II) for the care of decedent if the contract had been terminated; and (Count III) the recovery of the entire residue of the estate under Article Third of the will, alleging further that they had cared for and looked after the deceased and had provided him with a home and the comforts of life during his declining years. The Executor denied all substantive allegations of each Count. As stated, the causes were consolidated for trial.

The contract in question was dated May 8, 1967. Therein the Ahlands agreed to accept the responsibility of caring for decedent, to provide him with food, laundry, mending, generally to look after his welfare, and to look after and clean the mobile home in which he lived. The decedent agreed, in consideration of the performance by the Ahlands of all the matters so stated during his lifetime, that they should have his farm (described therein). It was further mutually agreed that if either party became *"dissatisfied"* with the arrangement and desired to terminate it, the Ahlands should be paid $125 a month for their services if decedent was "ambulatory," or $175 a month if he required "intensive care"; also, that if he required hospital or nursing home care the contract should terminate. In conclusion, it was specifically stated that *"either party to this contract may terminate the same at any time."* (Italics are ours.)

Sundry material things are not clearly shown in the record. Apparently decedent sold to the Ahlands the house on his farm with a lot of approximately 100 x 130 feet. This took place in the spring of 1967. It is not shown how long he had known the Ahlands, but apparently they were newcomers to that immediate neighborhood. At about the same time he bought a mobile home which he placed (or had already placed) near the house and he continued to live there to the very time of his death. There is rather conclusive evidence that decedent remained well and very active for one of

his age until the actual time of his death from a heart attack. During much (and probably most) of the time for the last year or so he was financially interested in a florist shop in Memphis, spent most of his time there, and made deliveries, even on the morning of his death.

There is much dispute as to just how much the Ahlands did for the decedent. They were barred from testifying under the Dead Man's Statute, but their son and many of their acquaintances testified. It will not be necessary to review this testimony in detail. There was evidence: that Mr. Ahland drove decedent to various places in decedent's car, although the latter could and did drive regularly; that decedent was frequently at the Ahlands' house, ate many meals there, and "visited" with them and with whomever else might be there; that he went to a few special events with the family, such as one or more fairs or reunions, dog races, etc.; that he ate several special meals there, including those on Christmas and a "joint" birthday; that food was sometimes taken to him when he was "sick" or "didn't feel good" (but no instances of illness were shown); that members of the family would "look in on him" to make sure that he was all right; that Mrs. Ahland did some of his laundry, although the amount is in considerable dispute; that she went over and changed his sheets and "cleaned up" his place. One witness testified that decedent said that after he was gone his tractor belonged to "Butch" (Mr. Ahland), and another testified that he said that he thought as much of the Ahland girls as if they were his own; and still another testified that he said that "what he had would be theirs."

On the other hand there was evidence: that decedent was the owner or part owner of a florist shop in Memphis from the summer of 1967 until his death, except for a period during 1968; that he worked actively in the shop and on deliveries; that he ate his lunch at the "Chuck Wagon" (or another nearby cafe) every day (at least since the spring of 1967) and occasionally ate his "supper" at one or the other of those places; that perhaps three times a week or even oftener he bought groceries at the end of the day, took them home and prepared his meals, and that this continued to the time of his death; that decedent had, from September 1967 to the week before he died, taken his laundry to the local laundromat once a week where the operator washed it for him and ironed what needed to be ironed; this consisted of his personal clothing, sheets, pillowcases and towels. The opinions of some of these witnesses, admitted without objection, were that no one was taking care of the decedent during the last year or more of his life, but that he was taking care of himself.

In October 1967, a few months after the execution of the contract for decedent's care, he and Mrs. Ahland came to the office of Mr. Smoot; decedent complained about the food he was getting, said that he was tired of eating canned soup, that he could open a can himself, and also that someone had consumed a fifth of whisky that he had in his place, and that he never got enough milk to drink. He produced his copy of the contract and said that "I want out of this thing," and that he wanted to terminate it. Mrs. Ahland replied, "Well, its all right with me." Mr. Smoot made a notation of termination on decedent's copy of the contract, and it was then arranged that Mrs. Ahland would come back and bring in her copy, but she never did. The foregoing came from the deposition of Mr. Smoot, who was unable to attend the trial because of illness. There was a somewhat similar conversation a little later between Mr. Smoot, decedent and Mr. Ahland. Mr. Smoot further testified that after the "termination" of the contract, the Ahlands performed little or no services for decedent. It seems that decedent took title to the mobile home in his name and that of Mrs. Ahland, that it was sold after his death, and that she received one-half of the proceeds. Decedent appears to have been more or less estranged from his brother, Hosea, and a witness testified that

decedent said that he did not intend to let the brother have anything.

Mr. Smoot in his deposition explained the allegation in his petition concerning a refusal to exercise his power of appointment. He testified that the reason for this was that in his opinion there was no one who had cared for the decedent as the latter had intended, and as that intention had been rather fully conveyed to him. Mr. Smoot had very frequently been in touch with decedent up to the time of his death; he had also prepared the "contract for a deed" by which decedent had sold his farm, with payments to be made over a period of years. The contract was inventoried in decedent's estate.

The trial court announced at the beginning of the trial, before any evidence was heard or the matter argued, that it had examined the pleadings in the declaratory judgment suit and had concluded that the provision of Article Third granting the power of appointment of the residuary estate to the Executor was "invalid and unenforceable." It further announced that it thought that the remainder of the Article was valid, and it proceeded to hear evidence so that it might determine who had "furnished the major part of his [decedent's] care and so forth." After hearing the evidence, which the Court noted was not "nearly as complete" as might be wished, it reviewed the evidence orally and concluded that while decedent was in reasonably good health, what he wanted was "affection and ˏattention * * * those little things people can do to make life more comfortable * * *." It further stated that since the power granted to the Executor was void, the choice had fallen on the Court. It then concluded that, although there were inconsistencies in the record, the Ahlands had rendered and continued to render to decedent the services contemplated in the will and that they should have the residuary estate. Judgment was rendered accordingly in the declaratory judgment suit. The Court further ruled that the issues in the suit by the Ahlands under

the contract had thus become moot. While the Court did seem to infer orally that the evidence did not show a cancellation of the contract, the issues raised thereon were not decided. Both the Executor and Hosea, the brother, have appealed.

Several issues are presented, collectively or alternately, including these: was the trial court correct in holding that the discretionary power vested in the Executor was void, and are the two parts of Article Third separable, as the Court necessarily held? If they are separable, may the *Court* exercise the discretion to select a person or persons to receive the residue? Alternately, if the judgment is reversed, should the cause be remanded for a trial and judgment on the cancellation or termination of the contract and the supposed performance under it? And lastly, also in the alternative, if the Executor's power is valid, must he file some formal instrument in the Probate Court stating his election?

If the power granted to the Executor is valid, we need not consider the questions of separability or of the Court's power to substitute its own discretion. This question of validity has not been sufficiently briefed on either side. It is true that there is little Missouri authority; we have been required to go to the textbooks and reference works. The Missouri cases cited by the Executor and heir hold generally that a power granted to a widow as life tenant to distribute a decedent's property in remainder among some or all of their children is enforceable. Crews v. Crews, Mo., 240 S.W. 149; Lawless v. Kerns, 242 Mo. 392, 146 S.W. 1169. These are the only cases cited by appellants on the point. They also cite 41 Am.Jur., Powers, § 7, p. 811, which says that in the creation of a power the class to be benefited and the person or class of persons must be designated in or clearly ascertainable from the instrument. Respondents cite: 96 C.J.S. Wills § 1062(d); Clark v. Campbell et al., 82 N.H. 281, 133 A. 166; Section 474.320, RSMo 1959, V.A.M.S.; and 108 A.L.R. 1095, 1098. The statute cited is merely our statute providing the mode in

which wills shall be executed. That citation is simply an indirect argument that the Executor could not make a will for the decedent. In 96 C.J.S. Wills § 1062(d) it is said, in substance, that a power of appointment should be made in clear and unequivocal language, but that a devise may thus be made to such person or persons as another may designate, so long as the designation is limited to an identifiable class or group; it is further said there that failure to provide for the devolution of the property in the event the power is not exercised does not invalidate the grant of the power. In Clark v. Campbell, supra, the testator listed numerous classes of personal property, including books, pictures, bric-a-brac, antiques, hunting and fishing equipment, rugs, scrapbooks, canes, etc., and gave to his trustees the power to dispose of any and all such articles to such of his "friends" as they should select, as mementos from him. The Court held that, while such a power may be granted where provision is made for definite and ascertainable beneficiaries, the designation of "friends" was too indefinite. The facts are not really comparable to ours. The citation of 108 A.L.R. 1095, 1098, is of little or no assistance here; it has reference to provisions granting to some person the power to change a will or to make disposition of the property contrary to the will as written. Respondents also cite Citizens' Bank of Lancaster v. Foglesong, 326 Mo. 581, 31 S.W.2d 778, as holding that a power of appointment is ineffective until it is exercised.

There are a good many cases construing the validity of powers granted in charitable trusts. These cases disclose a great liberality in upholding the discretionary powers of trustees and executors in selecting and designating the recipients or beneficiaries. One of the leading cases in this part of the country is Gossett et al. v. Swinney et al., C.A. 8, 53 F.2d 772, where the will granted to the trustees the absolute power of disposal (involving millions of dollars) to such "charitable, benevolent, hospital, infirmary, public, educational, scientific, literary, library or research" purposes in Kansas City, Missouri, as they might select. After a most thorough review of the Missouri authorities the Court held that, under Missouri law, the power thus granted was valid, and that the classification was sufficiently definite. We do not rely on that case here because the courts generally seem to be more liberal in construing such powers in the cases of charitable grants than in private grants.

■ We need not cite authority for the proposition that the courts, in construing wills, should seek for the intent of the testator, and should glean this from the "four corners" of the will; also that, as so ascertained, the intent is to be enforced unless it is in violation of some recognized principle of law. We hold that this decedent intended for Mr. Smoot to select the person or persons who had performed "the major portion of caring for me during my declining years," and that this intention also included the discretion and power in Mr. Smoot to determine that *no one* (except himself) had rendered that care. This leaves us with the necessity of deciding whether that intent was in violation of any recognized principle of law.

As already indicated, the cited cases are of little help, but we note again the citation of 41 Am.Jur., Powers, §§ 6 and 7, p. 811 et seq., where it is indicated that a power of appointment is valid if the class of persons from whom the beneficiary is to be selected is designated or clearly ascertainable. The same rule is, in substance, stated in 96 C.J.S. Wills § 1062(a) cited by respondents. In Page on Wills (Bowe-Parker Revision) Vol. 4, § 36.4, it is stated that a third person may be given power to select the beneficiaries and to determine what share each beneficiary shall receive; also (§ 36.5), that this may apply to the residue. In § 45.16 (Vol. 5, p. 542 et seq.) it is indicated that if the power is wholly general it is of doubtful validity, but that such powers are valid if the class is fixed "with a reasonable degree of certainty." It is sometimes stated that the class or group

from which the selection is to be made must be "ascertainable," as in 96 C.J.S., supra. In Page, § 45.23, Vol. 5, p. 563 et seq. it is said that the power may be granted in such terms that the donee may exercise his own discretion in determining whether or not the power should be exercised, even though the class is sufficiently specified; and further, that if the donee does not exercise the power, the members of the class cannot assert any interest in the property. If there is no "gift over" and no (further) residuary clause, the property passes by intestacy.

Instances may be found where the power attempted to be granted was held to be too indefinite as: in Egleston v. Trust Co. of Georgia, 147 Ga. 313, 93 S.E. 878, the power was to provide liberally for any person "overlooked by me," if the executors should feel that such was an "oversight"; in Clark v. Campbell, supra, where the power was to give mementos to "friends"; or, as in Nichols v. Allen et al., 130 Mass. 211, 39 Am.Rep. 445, where the grant was to the executors to dispose of the surplus by distributing it "to such persons, societies or institutions as they may consider most deserving." But, In Re Lawrence's Estate, 104 N.H. 457, 189 A.2d 491, a power granted to the executrices to distribute property to such of decedent's relatives and in such amounts as the executrices should determine in their sole discretion was held valid. The Court stated that such had long been the New Hampshire law, so long as the donee of the power acted "within the bounds of reason." Lear v. Manser et al., 114 Me. 342, 96 A. 240, is one of the two cases we found in which there were provisions somewhat similar to ours. The will provided that the executor should distribute the residue to such person or persons or institution (or to any of them) "as shall care for me in my last sickness" and as, in his discretion, may be "equitably entitled" thereto. The executor elected to distribute the residue to a woman at whose home the deceased had boarded, and who cared for him in his brief last illness of two or three weeks. It was there claimed that the class

of beneficiaries was not sufficiently designated. The Court recognized the rule that the beneficiary must be capable of identification, and held that the wording used by the decedent had a clear meaning. The Court did seem to rely, at least in part, upon the fact that the evidence established the recipient as the proper person to receive the estate, rather than relying upon the executor's discretion. We fail to see the importance of this if the power, admittedly granted in "clear" terms, was valid. In the case of In Re Long's Estate, 190 Wash. 196, 67 P.2d 331, the testatrix left one-half of her estate to the person or persons who rendered her the greatest service "in her declining months or years," with the power granted to her executor to select such person or persons. The Court held there (in a contest with the Inheritance Tax Division) that the power granted was too indefinite, but in doing so it cited cases which, to us, do not seem analogous.

Missouri has recognized, as already stated, the validity of broad powers granted to a life tenant (particularly a widow) to divide the remainder of a testator's property among children, in such manner as the life tenant should see fit. In 56 Mich.Law Review 1167 et seq. there is an article which discusses the validity of such powers when granted to executors. The author says that they are much more liberally construed when considered as *powers* than when (as some courts apparently do) considered as *trusts*. He indicates that there is little or no explanation in the cases for any such basic distinction. He further states: that when the grant is considered as a power the testator need only furnish a standard whereby the appointees can be identified as falling within the designated class; that the cases are somewhat technical and inconsistent, but that the approach which considers such a grant as a "power" should be favored, because thereby the testator's intent can be more readily carried out.

We have determined that the class of persons specified in this will is sufficiently definite and the persons re-

ferred to sufficiently ascertainable to make valid the discretionary power vested in the Executor. It should not ordinarily be difficult to select a class of persons who might conceivably have furnished the major part of the care of a testator during his "declining years," nor is there any reason here why it would be. The class would almost certainly be small, and this testator limited it still further by eliminating institutions operating for pay. The very fact that the Court saw fit to make a selection of the persons who should receive the residue as members of such a class would seem to indicate that there was a readily ascertainable class. We hold that the power was valid, and that the Executor had the power and right to designate such a person or persons; we further hold that he lawfully could, within the power granted and consonant with the intent of the testator, elect to declare that no one aside from the testator himself, had furnished such care. In effect, the Executor here has done the latter, as explained by him both in his pleadings and in his deposition. In that view of the matter it would seem that the situation which the testator was looking forward to, i. e., the "declining years," simply never came to pass. There has not been a mere refusal to act by the Executor, although if he had done so under a valid power, there is good authority to the effect that the property would pass intestate. The authorities further seem to indicate that the donee of the power should act in a rather formal manner; for instance, if he designates a beneficiary or beneficiaries he should do so by some instrument sufficient to pass the estate or property. We suggest that it would be preferable here for the Executor to file in the probate court, if he is still of the same mind, an instrument formally stating his decision and election that no person or persons aside from the testator himself, performed the major part of caring for him during his declining years, or complied with the requirements of Article Third of his will, and that the Executor has therefore declared that no person or persons were or are eligible to receive the residue of the estate under said Article. The instrument should be acknowledged. Thereupon the residue of the estate of the testator will pass under the intestacy laws. It is not necessary now for us to decide whether the parts of Article Third are separable.

Under this ruling the issues under the contract are not moot. They were not decided in the judgment as entered; although we could perhaps decide that case here, we prefer to remand it for a determination by the trial court of the following: (1) whether the contract was terminated by the testator; (2) if not, whether its requirements were fully performed by the Ahlands, and (3) if so, their remedy. We feel that we should note here again that by the terms of the contract it was agreed that "either party to this contract may terminate the same at any time." It did not require mutual consent. The evidence in the present record was introduced and received in both cases. It should thus be considered upon retrial, since our decision here is not the granting of a new trial in the contract case, but a mere continuation of that hearing, which was incomplete. The parties should be allowed to introduce further evidence, if desired, and certainly the record should be supplemented by the identification (if available) and admission of testator's copy of the contract with Mr. Smoot's notation thereon. We note also that in the original answer the Executor affirmatively alleged the cancellation of the contract, but omitted this in his answer to the second amended petition; he should be given leave to amend the latter answer if he so desires. The contract in question here could not in itself pass title to real estate, and the case was not tried upon the theory of a suit in equity to enforce a contract for a deed. In fact, practically all of the land seems to have been sold.

The judgment is reversed in Cause No. 14 881, and Cause No. 14 877 is remanded for the completion of trial in accordance with this opinion. The Court will enter a new judgment in Cause No. 14 881,

as ordered herein, but should by a separate order *stay* the distribution of the residue of the estate until the issues in Cause No. 14 877 are tried and judgment entered; otherwise, such a distribution might possibly render ineffective, in whole or in part, any judgment rendered in Cause No. 14 877. The Court shall, prior to the entry of a new judgment in Cause No. 14 881, give to Mr. Smoot a reasonable opportunity to file in the Probate Court the instrument suggested herein, and to furnish and file in that cause a certified copy thereof.

It is so ordered.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.